OPINION OF THE COURT
Louis B. York, J.
Defendant Pfizer, Inc. (Pfizer) moves for an order (i) direct *601 ing a Frye hearing to determine whether the testimony of plaintiffs’ proposed expert on medical causation is admissible, or, alternatively, (ii) excluding plaintiffs’ proposed expert testimony on causation and granting summary judgment in favor of Pfizer.
Background
In this products liability action, plaintiff Robert Selig (Selig) alleges that he suffered a heart attack on July 8, 1998, as a result of taking Viagra, a drug manufactured by Pfizer, which has been approved by the Food and Drug Administration (FDA) for treatment of erectile dysfunction. Selig was prescribed Viagra in April 1998. Selig took three pills — one in April, one in May, and a final pill in early July, which was about four to six days before his heart attack.* Selig was 58 years old at the time of the heart attack. Selig had no history of cardiac problems, although he did suffer from high cholesterol and was overweight. Seng’s treating cardiologist, who performed a successful angioplasty on Selig following his heart attack, testified that, to a reasonable degree of medical certainty, Seng’s heart attack was caused by “a severe blockage to one of his heart arteries.”
In support of their theory that Viagra caused Selig’s heart attack, plaintiffs rely on the expert opinion of Dr. George I. Mallis. Dr. Mallis’ opinions are summarized in plaintiffs’ expert disclosure statement provided to Pfizer in accordance with CPLR 3101 (d). According to plaintiffs’ disclosure, Dr. Mallis will opine (i) that “there is a cause and effect relationship between the ingestion of sildenafil citrate (Viagra is the trade name) and the onset of deleterious cardiac consequences in men who have any pre-existing cardio-vascular disease” (para 3), and (ii) that “the myocardial infarction (i.e. heart attack) sustained by Robert Selig on or about July 7, 1998 was the result of his ingestion of Viagra during the period of April 1998 through July 1998” (para 4).
Dr. Mallis’ theory of causation is based, in part, on the studies and data regarding the long-term effects of drugs, like Viagra, which work by inhibiting certain enzymes, and are known as phosphodiesterase inhibitors. According to plaintiffs’ disclosure, “Dr. Mallis will opine that while the precise mechanism is not yet fully understood, clinical data has overwhelm *602 ingly demonstrated that phosphodiesterase inhibiters (including Viagra) have significant and deleterious consequences to the cardiovascular system” (para 9). In particular, plaintiffs’ disclosure relies on a study, which Dr. Mallis authored with others, of oral milrinone, a phosphodiesterase inhibitor, tested for the treatment of heart failure. The study concluded that treatment with oral milrinone resulted in earlier mortality in patients with severe heart disease.
Plaintiffs’ disclosure indicates that Dr. Mallis’ opinions are also based on a consensus document published by the American College of Cardiology and the American Heart Association in which it was purportedly found that “patients with prior cardio-vascular disease were not adequately studied, and that Pfizer only studied a small fraction of patients with pre-existing heart disease” (para 11). Plaintiffs’ disclosure also points to Pfizer’s own findings that Viagra causes a drop in blood pressure and an increase in heart rate. Dr. Mallis’ opinion is that such drops in blood pressure could have “deleterious or fatal consequences” in people with preexisting heart disease, including “myocardial infarction, stroke or death” (para 22).
The Motion
Pfizer argues that Dr. Mallis’ methodology and theory of causation are not generally accepted in the scientific community and therefore do not satisfy the Frye test, which governs the admissibility of novel scientific evidence in New York State.
In support of its position, Pfizer relies, inter alia, on affidavits from experts who disagree with Dr. Mallis’ opinions and methodologies. For instance, Pfizer submits the affidavit of Dr. Milton Packer, who designed and directed the milrinone study on which Dr. Mallis relies. Dr. Packer states that there is “no scientific basis to conclude that the [study of milrinone] has any applicability to Viagra” (Packer affidavit para 15). Dr. Packer also states that while milrinone inhibits an enzyme known as phosphodiesterase type 3 (PDE3), Viagra inhibits a different enzyme known as phosphodiesterase type 5 (PDE5). According to Dr. Packer, “Phosphodiesterase enzymes are not all the same. Different types of phosphodiesterases regulate different biological processes in different parts of the human body. For that reason, drugs that inhibit different types of phosphodiesterases can have very different clinical effects and it is not scientifically acceptable to extrapolate from the study of a drug that inhibits one type of phosphodiesterase inhibitor to predict the effects of [a] drug that inhibits a different type of phosphodiesterase.” (Packer affidavit para 13.)
*603 Dr. Packer further notes the “dosing regimes” of milrinone and Viagra are different and may affect outcomes. Specifically, he states that while patients in the milrinone study took the doses “four times a day for up to 20 months,” Viagra is used “intermittently” and “not more than once per day as indicated on the product label” (Packer affidavit para 14).
Pfizer also relies on the opinion of Dr. Ronald E. Gots, who states that he has studied and taught “causation assessment— the recognized scientific methods by which a drug, chemical or other substance can be connected to or ruled out as a cause of disease.” (Gots affidavit para 3.) Dr. Gots states that “plaintiffs’ disclosure for Dr. Mallis does not reflect a generally accepted methodology for formulating an accurate conclusion as to the causal relationship between Viagra and heart attacks” {id., para 7). In particular, Dr. Gots states that “plaintiffs’ disclosure does not cite any test or data indicating that men with preexisting heart disease who take Viagra have a higher incident of heart attack than men with pre-existing heart disease who do not take Viagra,” and that “ [c] onsequently, the proposition espoused in plaintiffs’ disclosure is nothing more than a speculative hypothesis” (id., para 17).
Pfizer also submits the affidavit of Dr. Edmund H. Sonnenblick, who is a professor of medicine and has written extensively in the field of cardiology. Dr. Sonnenblick contends that the clinical trials of Viagra show that the drug “does not increase the risk of serious adverse cardiovascular events or heart attack” (Sonnenblick affidavit para 15). Dr. Sonnenblick rejects plaintiffs’ assertion that patients with preexisting heart disease were not well represented in the trial studies, and opines that “Pfizer’s clinical studies of Viagra were well designed in accordance with generally accepted scientific practice and adequate to demonstrate that the drug is safe and does not cause heart attacks” (Sonnenblick affidavit para 19).
Dr. Sonnenblick describes the decrease in blood pressure caused by Viagra as “trivial” and “no greater than changes that typically occur doing the course of the day as a person changes posture, eats a meal or responds to stressful or relaxing stimuli” (Sonnenblick affidavit para 22 [d]).
With respect to the case at issue, Dr. Sonnenblick opines that Selig’s heart attack was caused by factors unrelated to Viagra, including blockage of his left anterior artery. Dr. Sonnenblick further states that by the time that Selig had a heart attack, the Viagra he had ingested six days earlier had left his bloodstream. In support of this opinion, Dr. Sonnenblick notes *604 that an FDA-approved, package insert shows that “Viagra reaches maximum concentration in the bloodstream within one hour of ingestion, it is metabolized rapidly and the drug is entirely cleared from the bloodstream within 24 hours following ingestion” (Sonnenblick affidavit para 27).
As for the consensus document relied on by Dr. Mallis, Dr. Sonnenblick notes that this study states that the use of Viagra “should be ‘dependent on individual clinical assessment’ if a patient falls into any of the following four categories: ‘(i) patients with active coronary ischemia who are not taking nitrates * * * (ii) patients with congestive heart failure and borderline low blood pressure and borderline low volume status, (iii) patients with complicated, multidrug, antihypertensive program, [and] patients taking drugs that can prolong the half-life of Viagra’ ” (Sonnenblick affidavit para 36, quoting Consensus Study, at 274). Dr. Sonnenblick then asserts that Selig does not fall within any of these four categories.
Plaintiffs counter that a Frye hearing is unwarranted because the scientific techniques on which Dr. Mallis relies are not novel. In his opposition affirmation, Dr. Mallis states that he has “applied a reliable, scientific methodology,” and that “there is nothing in any of the defense expert affidavits that do any more than register a disagreement with my opinions” (Mallis affirmation para 2). Dr. Mallis also states that “the mere fact that a new drug is placed on the market does not ipso facto render the science underlying the drug novel” (id., para 28).
Dr. Mallis chállenges Pfizer’s position that the study of milrinone has no application to understanding how Viagra causes heart attacks. He explains that phosphodiesterase inhibitors, such as Viagra and milrinone, are “still not fully understood” and that “the deleterious consequences of Viagra may be explained in the inhibitory effect of [phosphodiesterase type 3 found in milrinone], particularly when taken in conjunction with the overall experience of phosphodiesterase inhibitors and the significant adverse incidents that have been reported since Viagra has been on the market place” (Mallis affirmation para 31).
In support of his opinion that Viagra causes heart attacks in patients with preexisting heart conditions, and that the effect of the drug on these patients had not been adequately studied, Dr. Mallis quotes from the consensus document which states that: “ ‘Heart disease patients represented only a small fraction of the studied patients, and patients with heart failure, *605 patients with myocardial infarction or stroke within six months, or patients with uncontrolled hypertension were not included in these studies * * * there are possible problems in the use of Viagra in these patients that have not been adequately studied.’ ” Dr. Mallis also cites to (but does not attach) a report in the Journal of the American Medical Association which showed an increase of deaths per million among certain patients using Viagra.
Dr. Mallis opines that the conclusion by Pfizer’s expert that any effect from Viagra is limited to the time it stays in the blood stream “does not rise beyond the level of mere speculation” (Mallis affirmation para 41). Specifically, he states that “[m]edicine abounds with circumstances where drugs cause latent injuries, sometimes stretching 20-30 years.”
Discussion
The threshold standard for admissibility of novel scientific evidence in New York State is derived from Frye v United States (293 F 1013 [1923]). The Frye rule requires that innovative scientific evidence be based on “a principle or procedure [which] has ‘gained general acceptance’ in its specified field.” (People v Wesley, 83 NY2d 417, 422 [1994], quoting Frye v United States, supra, at 1014.) “[T]he particular procedure need not be ‘unanimously endorsed’ by the scientific community but must be ‘generally accepted as reliable.’ ” (Id., at 423, quoting People v Middleton, 54 NY2d 42, 49 [1981].) The proponent of a scientific procedure “is required to show the generally accepted reliability of such procedure in the relevant scientific community through judicial opinions, scientific or legal writings, or expert opinion other than that of the proffered expert.” (Cameron v Knapp, 137 Misc 2d 373, 375 [Sup Ct, NY County 1987].)
The Frye rule as applied in New York differs from the more “liberal” Federal standard established by the United States Supreme Court in Daubert v Merrell Dow Pharms. (509 US 579 [1993]; see, People v Wesley, supra, at 423, n 2). In Daubert, the United States Supreme Court rejected the Frye rule in favor of a “reliability standard” derived from Federal Rules of Evidence rule 702. Under the Daubert standard, the court makes “a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid” (509 US, at 592-593). In contrast, under Frye, the court does not determine whether a scientific technique is reliable but, instead, “whether there [is a] consensus in the scientific community as to its reliability.” (People v Wesley, supra, at 439 [Kaye, Ch. J., concurring].) Thus, the Frye test emphasizes *606 “ ‘counting scientists’ votes, rather than * * * verifying the soundness of a scientific conclusion’” (id., at 439). The Frye rule, although more commonly utilized in criminal cases, is “equally applicable in civil actions” (Collins v Welch, 178 Misc 2d 107, 109 [Sup Ct, Tompkins County 1998]; see also, Cameron v Knapp, supra [applying the Frye rule to exclude testimony of handwriting expert in medical malpractice action]). Plaintiffs, however, argue that the Frye rule does not apply here because Dr. Mallis’ testimony does not involve a novel scientific technique. It is true that the majority of New York cases in which a Frye standard has been applied involve the admissibility of obviously novel forensic and social science techniques. (See, e.g., People v Wesley, supra [DNA profiling evidence]; People v Hughes, 59 NY2d 523 [1983] [hypnosis]; People v Wernick, 89 NY2d 111 [1996] [neonaticide syndrome]; People v Fortin, 184 Misc 2d 10 [Sup Ct, Nassau County 2000] [Parental Alienation Syndrome].)
In contrast, the expert testimony at issue here is not based on an outwardly novel scientific technique. Nonetheless, as in the other cases applying the Frye standard, at issue here is whether Dr. Mallis’ theory is supported by accepted scientific methods, particularly because his conclusions are allegedly novel (see, e.g., Collins v Welch, supra, at 109-110 [in which court held a Frye hearing to determine the admissibility of physician’s theory that plaintiff’s illness was caused by chemicals and fumes at his workplace]; Oppenheim v United Charities, 266 AD2d 116 [1st Dept 1999] [excluding testimony of plaintiff’s expert where diagnosis of Multiple Chemical Sensitivity Syndrome had not gained general acceptance in the scientific community]; Lofgren v Motorola, Inc., 1998 WL 299925, *20 [Super Ct, Ariz, June 1, 1998, Sheldon, J.] [applying Frye standard to determine whether testimony of medical causation experts was admissible to show that plaintiffs’ exposure to trichloroethylene caused various diseases in plaintiffs]; cf., Wahl v American Honda Motor Co., 181 Misc 2d 396, 399 [Sup Ct, Suffolk County 1999] [engineer’s testimony, which was based on “recognized technical or other specialized knowledge,” is not subject to the Frye standard]). •
Indeed, in Daubert (supra) the District Court applied the Frye rule to exclude expert testimony that the ingestion of a drug approved by the FDA for morning sickness caused birth defects. And, although it was held that the District Court used the wrong standard, there was no question that the experts’ opinions were the proper subject of inquiry for the courts. In *607 fact, after remand, the District Court’s exclusion of the expert testimony was affirmed under the Daubert standard. (See, Daubert v Merrell Dow Pharms., 43 F3d 1311 [9th Cir], cert denied 516 US 869 [1995].)
Here, Pfizer has made out a prima facie case that the conclusion reached and methodologies utilized by Dr. Mallis are not generally accepted in the scientific community. For example, Pfizer asserts that in arriving at his conclusion that Viagra causes heart attacks, Dr. Mallis ignored dozens of clinical studies to the contrary and, in doing so, he failed to follow accepted scientific methodology. (See, Lofgren v Motorola, Inc., supra, at *20 [generally accepted scientific technique or methodology “does not permit scientists to selectively choose only those studies which support an hypothesis and to ignore the rest”].) Likewise, Pfizer’s experts have cast grave doubt on, inter alia, Dr. Mallis’ use of the study of milrinone to conclude that Viagra causes heart attacks, and whether Selig’s heart attack was caused by his ingestion of Viagra four to six days before its occurrence. Moreover, because Selig has no history of heart disease, Dr. Mallis’ criticism of the Pfizer study as it relates to patients with prior cardiac disease is not obviously relevant to this case. Thus, Dr. Mallis has failed to raise a genuine issue of fact to rebut defendant’s prima facie showing. Because the parties have totally exhausted the arguments and authorities in their submissions sufficiently in advance of the trial, the court cannot see how a Frye hearing can shed any more light on these issues. Dr. Mallis’ testimony is precluded and the action is dismissed. (Oppenheim v United Charities, 266 AD2d 116 [1st Dept 1999], supra.)
Conclusion
In view of the above, it is ordered and adjudged that Pfizer’s motion for summary judgment dismissing this action is granted, together with costs and disbursements as calculated by the Clerk of the Court.

 There apparently is some uncertainty as to the date that Selig took his last Viagra pill.