[4 NYS3d 475]

Raymond E. Kurz et al., Plaintiffs, v St. Francis Hospital, Roslyn, New York, et al., Defendants.

Supreme Court, Nassau County, December 11, 2014

*Kelly, Rode & Kelly, LLP*, Mineola (*Brian M. Dunphy* of counsel), for Manhasset Ophthalmology, P.C. and others, defendants.

*Bower, Monte & Greene, P.C.*, New York City, for St. Francis Hospital, Sued Herein as St. Francis Hospital, Roslyn, New York, defendant.

*Law Offices of Charles E. Kutner, LLP*, New York City, for Cardiothoracic Surgery, P.C. and another, defendants.

*Geisler & Gabriele, LLP*, Garden City, for The Interventional Heart Group, PLLC and others, defendants.

*Law Offices of Michael A. Haskel*, Mineola, for plaintiffs.

## OPINION OF THE COURT

ARTHUR M. DIAMOND, J.

Defendants move by motion in limine for an order precluding plaintiffs' expert from giving certain opinions regarding causation at the trial of this matter, or in the alternative for a pretrial hearing to determine the admissibility of said expert testimony. The plaintiffs oppose the motion. For the reasons stated below, the applications are denied and the plaintiffs' expert will be permitted to express an opinion on the issue of causation.

### Facts

On December 28, 2008, the plaintiff presented to St. Francis Hospital, Roslyn, New York complaining of tightness in his chest. He was treated immediately with cardiac catheterization which revealed several blockages. The next day defendant Dr. Fernandez performed quadruple bypass surgery on the plaintiff. On December 31, plaintiff experienced rapid atrial fibrillation and Cardizem was ordered to reduce the condition. It did not work and so at approximately 10:30 a.m. plaintiff was given a bolus of Amiodarone in a dosage of 150 mg in 100 cc of D5W over 10 minutes. Thereafter an Amiodarone IV drip was ordered to be given at 1 mg per minute for six hours and then to decrease to .5 mg per minute.

Within three hours after the administration of the medication, plaintiff complained of visual disturbances as though he

had dirty glasses over his eyes. A neurological consult was performed by defendant Dr. Laura Schoenberg who concluded, after ordering a brain CT scan and a carotid Doppler which were negative, that plaintiff had blurry vision due to Amiodarone. On January 1, 2009, the defendant Dr. Minadeo, a cardiologist, examined the plaintiff and reduced the Amiodarone to 400 mg by mouth three times daily for five days. The drug was then discontinued on January 2, 2009. Also on that day an ophthalmology consult was performed by defendant Dr. Robert Broderick. He noted swelling behind each retina and edema around the optic nerve bilaterally. His opinion was that plaintiff could have an arterial occlusion secondary to plaque or clot. Dr. Broderick also saw the plaintiff on January 3, 2009 and examined him. He observed hemorrhages near the optic disc in the right eye that were suggestive of ischemic optic neuropathy. Plaintiff was in fact given that diagnosis after another consultation. His vision loss was 20/400 in each eye.

Plaintiff maintains via an affidavit of an expert that the administration of the Amiodarone caused the plaintiff's vision loss.

In support of their application, the defendants submit the affidavit of Dr. Murk-Hein Heinemann who states that he performed a thorough literature search concerning Amiodarone and its association with optic neuropathy. Numerous studies have been conducted that conclude there is no medical or scientific proof that *short-term* use of intravenous Amiodarone causes optic neuropathy or blindness or that there is an increased risk of ischemic optic neuropathy in patients who are treated with it. He further opines that there are many other possible causes of plaintiff's visual loss—most commonly complications from his complex heart surgery including insufficient blood flow to the optic nerve. Dr. Heinemann further opines that according to his research the average duration of visual loss identified with the drug was nine months. He states that the plaintiff's expert opinion that the plaintiff's visual symptoms which occurred within three hours of the drug being administered lacks a scientific basis and is unreliable. He states that the medical and scientific communities do not accept the proposition that such short-term use of Amiodarone causes visual loss. Dr. Heinemann also disputes the plaintiff's expert opinion that the plaintiff received a high dosage of Amiodarone, by claiming that the plaintiff received precisely what Wyeth, the manufacturer, recommends.

Defendant Schoenberg maintains that a conclusive link between disc edema and Amiodarone has never been established, let alone when administered for only a few hours. Defendant argues that the fact that the alleged symptoms appeared after the administration of the drug is insufficient to establish causation without relevant scientific data establishing a causal link between the alleged injury and the alleged malpractice, citing *Hooks v Court St. Med., P.C.* (15 AD3d 544 [2d Dept 2005]). In response, plaintiffs first claim that the defendant Dr. Schoenberg believed that plaintiff's visual disturbances were caused by the Amiodarone when she indicated in her medical notes that his visual problem started when Amiodarone/Lasix/ magnesium was pushed. Likewise plaintiffs indicate that defendant Dr. Fernandez noted in his discharge summary, "it was thought" that they were "medication related" when referring to the plaintiff's complaint of visual disturbances. Plaintiffs next argue that this issue has, in effect, been decided by the previous summary judgment decision rendered by Hon. Thomas Phelan which order denied the defendants' motions. Defendants already argued in the summary judgment motion papers that there is no medical scientific proof that short-term use of Amiodarone causes optic neuropathy or blindness and having failed in that motion, the plaintiffs argue that it is the law of the case and should not be the subject of a preclusion application at trial. Plaintiffs distinguish the case defendants rely on (*Kaczor v Vanchem, Inc.*, 262 AD2d 1041 [4th Dept 1999]) because the scientific issues raised in that case were unsupported by any accepted medical basis contained in the summary judgment motion. Here, the medical records support the claim of causation.

Plaintiffs' opposition includes the affidavit of their expert who states that he is involved in the care and treatment of patients who have been administered Amiodarone and is familiar with its properties. He states that among the known properties of the drug is its rapid rate of absorption especially when given intravenously as was done here. He notes that it is this rapid absorption characteristic that makes it so valuable in treating tachycardia. This rapid absorption is a known cause of edema, including optic disc edema, citing medical literature titled "Purvin, et.al. Optic Neuropathy in Patients Using Amiodarone, Arch. Optholmol., 2006 124; 696-701" (affirmation in opposition, exhibit E). The plaintiffs' expert disagrees with Dr. Heinemann's opinion that a patient cannot develop ischemic

optic neuropathy within hours of administering Amiodarone, and disagrees that there is no support for that consequence in the research or literature. Plaintiffs' expert states that Heinemann's opinion does not take into account the circumstances surrounding this particular patient. He notes the size of the first IV dose, 150 mg over 10 minutes which he describes as significant, followed by 900 mg followed by 400 mg three times daily over the next two days.

In response to defendants' insistence that it is almost impossible for a patient to develop optic neuropathy after a short time, plaintiffs' expert states that the literature describes a wide range of timing for developing an optic neuropathy while on the drug, citing a study that found the range to be from 3 to 72 days. The expert also states the condition of the plaintiff at the time and the fact that the symptoms came almost immediately after the IV push and continued to worsen over the next several days, is indicative of causation.

### *Frye, Parker, Cornell*

In considering the defendant's motion in limine, the court begins its analysis with the now over 90-year-old language found within the decision of *Frye v United States* (293 F 1013, 1014 [DC 1923]) and which language still governs the admissibility of expert testimony on causation in our courts:

> "The rule is that the opinions of experts or skilled witnesses are admissible in evidence in those cases in which the matter of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it, for the reason that the subject-matter so far partakes of a science, art, or trade as to require a previous habit or experience or study in it, in order to acquire a knowledge of it. When the question involved does not lie within the range of common experience or common knowledge, but requires special experience or special knowledge, then the opinions of witnesses skilled in that particular science, art, or trade to which the question relates are admissible in evidence."
>
> " '*Frye* is not concerned with the reliability of a certain expert's conclusions, but instead with "whether the experts' deductions are based on principles that are sufficiently established to have gained general acceptance as reliable" ' . . . . Put

another way, '[t]he court's job is not to decide who is right and who is wrong, but rather to decide whether or not there is sufficient scientific support for the expert's theory.' " (*Lugo v New York City Health & Hosps. Corp.*, 89 AD3d 42, 56 [2d Dept 2011] [citations omitted].)

A *Frye* hearing is necessary when an expert seeks to introduce a novel theory of medical causation. (*Ratner v Mc-Neil-PPC, Inc.*, 91 AD3d 63 [2d Dept 2011].) In *Ratner*, plaintiff sought to advance the novel theory that plaintiff's cirrhosis of the liver was attributed to the use of acetaminophen which the Court held was not properly founded on generally accepted methodology and was inadmissible.

Based upon the foregoing, the court states at the outset that it finds that there is no *Frye* issue regarding the basic scientific assumptions upon which plaintiff makes his claim. The general causation claim by plaintiff that Amiodarone causes vision loss or blurry vision is not a novel medical theory of causation. There is ample evidence in the moving papers that visual disturbances are known side effects of the administration of Amiodarone. The manufacturer of the drug recognizes this fact. General causation is clearly established. The next inquiry is whether this is an injury of a type addressed by our Court of Appeals in *Parker v Mobil Oil Corp.* (7 NY3d 434 [2006]) and *Cornell v 360 W. 51st St. Realty, LLC* (22 NY3d 762 [2014])— that is, having established general causation, does the plaintiff have a requirement to establish specific causation and if so has he done so. The defendants maintain that plaintiff fails the *Frye* test and so the court need not address the specific causation tests of *Parker* and *Cornell*, but argue that even if the plaintiff passed the *Frye* test he likewise fails the *Parker* and *Cornell* tests. For the reasons stated below, the court finds that the "specific causation" analysis of these cases is not strictly applicable to the case at bar and that plaintiff has met his burden on that issue.

In *Parker v Mobil Oil*, the plaintiff Eric Parker had worked for 17 years as a gas station attendant and alleged that as a result of that work he had been exposed to benzene both by inhaling it and exposing his skin to it. He claimed that such exposure caused him to develop "acute myelogenous leukemia" (AML). Benzene is a known carcinogen. Defendants moved in limine to preclude plaintiff's expert's testimony on the issue of medical causation. Their two experts gave opinions (1) that

acknowledged that there is an increased risk of AML for service station employees exposed to large amounts of benzene but the low levels of benzene exposure resulting from gasoline service station workers were below the practical threshold dose necessary to initiate the leukemia process (*Parker* at 443); and (2) that there was virtually no reliable evidence to indicate that a causal relationship exists between chronic exposure to benzene at 10 ppm or lower and the development of AML. To establish causation, the expert stated, it is necessary to know the amount of benzene sufficient to cause AML and the amount of benzene to which the particular plaintiff was exposed. (*Id.* at 444.)

In opposition Parker's experts argued that there is a difference of opinion in the scientific community as to what level of benzene exposure causes leukemia and cited to a National Institute for Occupational Safety and Health study of rubber plant workers in Ohio which found a relationship between increasing cumulative benzene exposure and leukemia mortality. He opined that the risk of mortality was about 150 times background over a 40-year working lifetime from exposure to benzene at 10 PPM and at 5 PPM the risk was 12 times over background and at 1 PPM the risk was doubled. This expert also relied on the fact that the Occupational Safety and Health Administration had lowered the previous workplace standard for oil refinery workers from 10 PPM to 1 PPM and in sum stated that it is therefore unlikely that Parker would have contracted leukemia without his specific occupational exposure to benzene.

The Supreme Court denied the defendant's application without holding a *Frye* hearing. The trial court identified the issue as being whether the causal relationship between benzene and AML had general acceptance in the scientific community. Acknowledging that Parker's experts did not cite to studies linking benzene in gasoline to AML, nor did they quantify Parker's exposure to benzene, it nevertheless found the experts opinions based upon generally accepted principles and methodologies satisfactorily established a causal link between Parker's work and his disease.

The Appellate Division reversed and dismissed the action framing the issue as "to what extent the plaintiff was required to establish the precise level of his exposure to benzene in order to establish that his AML was caused by it through a scientifically-reliable methodology." (*Id.* at 446.) The Court held

that plaintiff failed to quantify his level of exposure to benzene and that plaintiff's exposure exceeded it. The matter then went to the Court of Appeals. The Court noted at the outset that the *Frye* inquiry is a separate and distinct question from the admissibility question—that is, whether there is a proper foundation to admit the evidence. In language particularly useful in our analysis of the case at bar, the Court stated that a plaintiff's expert opinion on causation of *a toxin* should set forth that the *toxin* is capable of causing the particular illness (general causation) and that the plaintiff was exposed to sufficient levels of the toxin to cause the illness, i.e., specific causation. The question to be asked in *Parker*, then, was did the methodologies employed by Parker's experts lead to a reliable result—whether they provided a reliable causation opinion without using a dose-response relationship and without quantifying Parker's exposure. While the Court differed from the Appellate Division finding that it is not always necessary for a plaintiff to quantify exposure levels precisely or use the dose-response relationship, it nevertheless agreed with its result and affirmed the dismissal of the complaint, finding that Parker's experts failed to demonstrate that exposure to benzene as a component of gasoline caused his AML.

The Court of Appeals followed the *Parker* decision with its March 2014 decision in *Cornell v 360 W. 51st St. Realty, LLC* wherein the Court held that the plaintiff had failed to establish a causal connection between her respiratory illnesses and dampness and mold found in her apartment. The defendants also rely on the reasoning of the Court in this decision. As in *Parker*, *Cornell* is a case where the plaintiff claims that her exposure to a toxin, dampness and mold, caused her injuries. The plaintiff's expert offered three theories to rebut the defendant's expert. First, he attempted to discredit the credentials of their expert; second he highlighted the government reports and public health agencies that have discussed the dangers from the risk of harm from indoor mold exposure; finally he argued that the studies he relied on supporting general causation had in fact been accepted by the scientific community. The Court of Appeals rejected his methodologies and in so doing relied on the generally accepted methodology for evaluating epidemiologic evidence when determining whether exposure to an agent causes a harmful effect or disease. The Court quoted from the federal courts' Reference Manual on Scientific Evidence:

"Epidemiologists are ultimately interested in whether a causal relationship exists between an agent and a disease. However, the first question an epidemiologist addresses is *whether an association exists* between exposure to the agent and disease. An association between exposure to an agent and disease exists when they occur together more frequently than one would expect by chance. *Although a causal relationship is one possible explanation for an observed association between an exposure and a disease, an association does not necessarily mean that there is a cause-effect relationship.*" (*Cornell v 360 W. 51st St. Realty, LLC*, 22 NY3d at 783, citing Michael D. Green et al., Reference Guide on Epidemiology, in Federal Judicial Center, Reference Manual on Scientific Evidence 566, Federal Judicial Center [3d ed 2011].)

In the case before this court, defendants in fact argued to the court that plaintiffs have merely shown an association of optic neuropathy with Amiodarone but not a causal relationship.

Based upon the foregoing, the court finds that the plaintiff has met his burden of establishing that his expert's opinion on general and specific causation are based upon competent, admissible evidence. The court finds that the analysis relied upon by the defendants, namely the *Parker/Cornell* "tests" have somewhat limited applicability in a medical malpractice action as opposed to a toxic tort case as those two were. Those cases involved plaintiffs who were advancing admittedly novel claims that exposure to substances in their living environments—gasoline and mold—caused them injury. They were never able to quantify their exposure and therefore were never able to offer a specific theory that supported their claim. Neither plaintiff had available to them epidemiologic studies or statistics that established the scientific reliability of their claims. Future cases brought against exposure to toxins in our environment would clearly have to meet that standard. But here, where the cause of action sounds in medical malpractice, the factual predicate is vastly dissimilar. The plaintiff here was not exposed to a toxin but rather a specific drug that was dispensed to him under the care of a hospital and physician. That drug, on the market for decades, and used in the very manner intended by the manufacturer, has known serious side effects. The injury suffered by the plaintiff was of a type related to those known side effects—visual disturbances—and the court finds that there is no authority that establishes in

our tort law that it is incumbent upon the plaintiff to find a scientific study that found that this particular drug given over these specific days in these specific amounts causes injury. While it is certainly true that the administering of a drug followed by injury may not by itself be proof of causation and the basis for malpractice, that is not the case here. It seems that the more apt analysis is that of the Appellate Division in the matter of *Zito v Zabarsky* (28 AD3d 42 [2006]) wherein the plaintiff alleged that her doctor prescribed her excessive dosages of the medication Zocor causing her to develop polymyositis, an autoimmune disorder. The Supreme Court granted defendant's motion to dismiss accepting his argument that plaintiff had no medical or scientific literature expressly linking polymyositis to excessive doses of Zocor. The appellate court reversed. While agreeing that the plaintiff's medical opinion was novel, it held "that it is not necessary that the underlying support for the theory of causation consist of cases or studies . . . exactly parallel to those under consideration in the litigation. It is sufficient if a synthesis of various studies or cases reasonably permits the conclusion reached by the plaintiff's expert." (*Id.*, citing *Marsh v Smyth*, 12 AD3d 307 312-313 [2004].) In fact, the plaintiff's expert in *Zito* had but a single reference in medical literature to support their theory—an article in The Lancet which documented a single patient's development of polymyositis from daily doses of Zocor. Nevertheless the Appellate Division was satisfied that the conclusion was supported by generally accepted scientific principles and existing data.

Therefore, in cases where the plaintiff's expert opinion was based upon more than a theoretical speculation, or scientific hunch, the lack of textual authority directly on point pertains to the weight to be given to the expert's testimony, but does not preclude its admissibility. (*Lugo v New York City Health & Hosps. Corp.*, 89 AD3d 42, 59 [2d Dept 2011], citing *Zito v Zabarsky*.) In *Lugo*, the Appellate Division held that the Supreme Court was too stringent and rigid in finding that plaintiff's expert was precluded from testifying that the hospital's failure to timely diagnose and treat hypoglycemia caused a newborn's brain damage because there was no articles providing conclusive support for the theory of causation espoused by plaintiff's expert. The Court held that it was sufficient for plaintiff's expert to have quantified the level and duration of the hypoglycemia episode, and to have referenced the contents of articles that documented brain abnormalities in

other patients who experienced hypoglycemia to support plaintiff's causal connection between the infant's episode of hypoglycemia and the brain abnormalities later observed on his MRI film. (*Id.* at 63.)

Likewise, the theory of causation espoused by plaintiff in this action has an adequate foundation for admissibility. Here it is factually not disputed that the plaintiff was suffering from arterial sclerosis when he came to the hospital; that he was given a significant dose of Amiodarone via an intravenous "push" to treat his atrial fibrillation; that the dosage was stepped down until halted several days later; that he almost immediately suffered vision impairment, a known side effect of the drug; and that additionally two of the defendant physicians themselves attributed his vision loss to the medication. The notes of Dr. Schoenberg indicates that she ordered a CAT scan, and as a result, performed a differential diagnosis ruling out other causes of vision loss except the Amiodarone. The discharge summary of plaintiff's treating cardiologist, Dr. Fernandez, indicates plaintiff's loss of vision due to the administration of Amiodarone. The medical records, coupled with the existing literature indicating that vision loss is a known side effect of Amiodarone, is enough evidence to establish a foundation to admit plaintiff's expert's testimony on the issue of causation. The lack thereof of medical literature indicating vision loss within the exact time frame specified by plaintiff's expert goes to the weight, and not admissibility of his testimony.

The court has considered the remaining arguments raised by all parties, and they are hereby rejected.

The court is satisfied that the plaintiff has established a foundation for the admissibility of his expert's opinion at trial. The defendants' application is denied in its entirety.